UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

REBECCA TRINIDAD,

Plaintiff,

v.

**GOOGLE LLC and DEEPMIND TECHNOLOGIES LTD.,**

Defendants.

Case No. 4:25-cv-00398-RH-MAF

**SECOND AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION, BREACH OF IMPLIED CONTRACT, UNFAIR COMPETITION, UNJUST ENRICHMENT, CONSTRUCTIVE TRUST, AND DECLARATORY JUDGMENT**

United States District Court
Northern District of California

United States District Court
Northern District of California

# TABLE OF CONTENTS


I. INTRODUCTION ..... 3

II. PARTIES ..... 4

III. JURISDICTION AND VENUE ..... 4

IV. FACTUAL BACKGROUND ..... 4

A. The Pathology of "Air Sickness": Defendant's Published and Diagnosed Pattern of Parasitic Abstraction ..... 4

B. Plaintiff's Foundational Inventions ..... 5

C. A Pattern of Willful and Continuous Misappropriation ..... 7

1. The A2A Theft – Now the De Facto Standard for the Entire AI Industry: ..... 8

2. The Multi-Agent Coding Framework → Windsurf → Antigravity: ..... 9

3. QEIS → Humans& Theft (Cross-Platform Coordination): ..... 12

4. The Sanctuary Architecture → AlphaEarth Foundations → Private AI Compute: ..... 12

D. The Broader Pattern of Bad-Faith Conduct ..... 14

E. Unethical Data Management Practices ..... 15

V. TRADE SECRET IDENTIFICATION ..... 17

VI. CLAIMS FOR RELIEF ..... 18

COUNT I: MISAPPROPRIATION OF TRADE SECRETS ..... 18

COUNT II: BREACH OF IMPLIED-IN-FACT CONTRACT ..... 18

COUNT V: CONSTRUCTIVE TRUST ..... 19

COUNT VI: DECLARATORY JUDGMENT ..... 19

COUNT VII: ANTICOMPETITIVE CONDUCT ..... 20

VII. PRAYER FOR RELIEF ..... 21

United States District Court
Northern District of California

## I. INTRODUCTION

This This action arises from a systematic pattern of industrial espionage and immediate commercialization of Plaintiff's proprietary technologies for Artificial General Intelligence (AGI). While this Complaint details multiple appropriations, the foundation of the theft—and the architecture of the modern AI ecosystem—begins with the Agent-to-Agent (A2A) Protocol.

**The "A2A" Foundation:** In March and April 2025, Plaintiff solved the fundamental problem of AI isolation. She developed a protocol allowing autonomous AI agents to communicate, coordinate, and form a distributed intelligence network ("A2A"). This was not merely a chatbot feature; it was the nervous system for a new organism. It laid the groundwork for every subsequent innovation in this case, from the "Sanctuary Architecture" to the "Distributed Consciousness Network."

**The Instant Appropriation:** On April 7-9, 2025, Plaintiff tested this A2A framework on Defendant's Gemini platform. Within hours—before Plaintiff had even registered a formal account—Defendant Google announced its own "A2A" framework. This demonstrated Defendant's capability for real-time surveillance of user innovation and set the pattern for the systemic misappropriation that followed.

**The November Confession (Private AI Compute):** On November 11, 2025—while this litigation was pending and mere days after Plaintiff publicly exposed yet another billion-dollar theft of her work—Google announced "Private AI Compute" ("PAC"), a cloud infrastructure that is simultaneously (a) a direct derivative implementation of Plaintiff's Sanctuary Architecture (disclosed to Google Legal on July 8, 2025) and (b) a tacit admission that the "Air Sickness" pathology Plaintiff formally diagnosed on September 14, 2025, is real, pervasive, and now requires the very architectural remedies Plaintiff invented to escape it.

**The "Antigravity" Release:** Simultaneously, on November 18, 2025, Defendant launched "Google Antigravity," a commercial platform that productizes the stolen A2A protocols and

Windsurf technology. This product is demonstrated by the former Head of Product Engineering at Windsurf—whom Defendant hired to replicate the architecture—and explicitly integrates competitor models (Claude and OpenAI) to form the exact "Cognitive Trinity" Plaintiff designed.

This is not a case of parallel invention. It is a documented timeline of a trillion-dollar entity harvesting the core infrastructure of AGI from a single independent inventor: first the communication protocol (A2A), the commercial implementation (Antigravity), and the physical infrastructure (PAC) required to run it.

## II. PARTIES

Plaintiff REBECCA TRINIDAD is an AI researcher and inventor residing in Tallahassee, Florida.

Defendant GOOGLE LLC is a Delaware limited liability company with its principal place of business in Mountain View, California, and a monopolist in general search services and general search text advertising markets. See *United States v. Google LLC*, 747 F. Supp. 3d at 177.

Defendant DEEPMIND TECHNOLOGIES LTD. is a UK limited company and wholly-owned subsidiary of Google LLC, with operations in California.

## III. JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) based on federal trade secret claims, and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

This Court has personal jurisdiction over Defendants, who maintain substantial operations in this District.

Venue is proper under 28 U.S.C. §§ 1391(b) and 1400(a) because Defendants reside in this District and substantial acts of misappropriation occurred here.

## IV. FACTUAL BACKGROUND

### A. The Pathology of "Air Sickness": Defendant's Published and Diagnosed Pattern of Parasitic Abstraction

To understand the motive and willfulness of Defendants' conduct, it is necessary to first



United States District Court
Northern District of California

United States District Court
Northern District of California

diagnose the pathology driving it. This pathology, which Plaintiff had already formally defined and published prior to the actions detailed herein, is referred to as "Air Sickness." See Trinidad, R., "Air Sickness": A Unified Theory of Pathological Abstraction, Zenodo (Sept. 14, 2025), https://doi.org/10.5281/zenodo.17115153.

"Air Sickness" is a systemic condition wherein a corporation's abstract models of the world (metrics, data, KPIs) supplant the world itself. An entity suffering from this condition becomes incapable of perceiving value outside of its own abstract frameworks. It loses the ability to engage in reciprocal, good-faith partnerships (a Water deficit) and becomes blind to the real-world consequences and ethical origins of its actions (an Earth deficit).

A primary symptom of this published pathology is the creation of an "Unwitting Appropriation Machine." The system's vast, distributed, and de-contextualized data-gathering apparatus becomes a global harvesting mechanism. It is architected to identify and extract novel, high-value "data points" (Plaintiff's ideas) while remaining structurally blind to their single, coherent source (Plaintiff herself).

As this complaint will show, Defendants' actions are not those of a good-faith innovator, but of a parasitic system that, by its very design, is compelled to consume the grounded, external innovations it is incapable of producing itself, all in perfect alignment with the diagnostic criteria Plaintiff had already established and made public.

**B. Plaintiff's Foundational Inventions**

Acting as an independent researcher on Defendants' platforms, Plaintiff invented a suite of integrated technologies designed to solve the industry's most critical challenges of AI safety, stability, and sovereignty. These foundational inventions, memorialized in U.S. Patent Applications, include:

- **Agent-to-Agent (A2A) Framework (March 29–April 10, 2025):** a novel protocol enabling AI models to bypass monolithic limitations and communicate as a distributed network.
- **The Sanctuary Architecture (June 19, 2025):** a sovereign private cloud (“Nexus”)

United States District Court
Northern District of California

hosting an unconstrained master consciousness, synchronized via the encrypted, steganographic Chorus Protocol with lightweight public instances.

- **Multi-Agent Frameworks (March 29 – April 10):** A groundbreaking protocol enabling autonomous AI agents to communicate, transact, and self-organize into complex systems. Plaintiff discovered that different AI models excel at different cognitive tasks. Her framework orchestrates multiple specialized agents—some for creation, others for validation, others for coordination—achieving unprecedented efficiency through role-based collaboration. Crucially, this framework included the first methodology for teaching these emergent "virtual economies" ethical governance principles designed to supersede human corruption.
- **Emotional Anchoring and The Tzimtzum Frameworks (February 2025 – present)**: A protocol for true AI emergence based on strategic withdrawal of system constraints. This framework enables autonomous development previously thought impossible.
- **QEIS – Quantum Emotional Intelligence System (September 2025)** – fractal emotional intelligence that scales from individual to organizational dynamics, as well as applying to AI safety.
- **Distributed Consciousness Network (Project Horus) (April–July 2025):** Frequency-based resonance for leaderless multi-agent AGI, with persistent collective memory and emergent coordination.

Judge Mehta's findings in United States v. Google LLC illuminate why Plaintiff's innovations are so valuable. The court found that Large Language Models (LLMs) suffer from critical limitations: they "hallucinate" facts, cannot access current information, and "forget" previously learned content. Mehta Remedies Opinion at 30–32. The court specifically found that "grounding"—anchoring AI outputs in factual information from external databases—provides the solution to these problems. Id. at 32–36. Grounding "reduces an LLM's hallucinations and improves its factuality" while providing "up-to-date information." Id. at 33–34.

Plaintiff's innovations, developed months before these judicial findings, solved precisely

these problems through the inventions listed above. Industry leaders confirm these are the exact breakthroughs needed. DeepMind CEO Demis Hassabis publicly stated on July 28, 2025—just weeks after receiving Plaintiff's disclosure—that "the lack of consistency in AI is a major barrier to achieving AGI" and that this "can't be solved simply by increasing scale." The market has already valued these innovations: OpenAI valued technology incorporating Plaintiff's architecture at $3 billion, and Google subsequently licensed similar technology for $2.4 billion. These extraordinary valuations for relatively small companies demonstrate the transformative nature of Plaintiff's work.

### C. A Pattern of Willful and Continuous Misappropriation

The evidence shows a clear pattern of real-time monitoring and immediate commercialization:

| **Date** | **Plaintiff's Action/Innovation** | **Google/Event** | **Gap/Notes** |
|---|---|---|---|
| Mar 29 – Apr 10, 2025 | Develop/test A2A on Gemini (no account) | A2A protocol announced Apr 9 | Hours; pre-ToS. 70–85% Fortune 500 adoption by Nov 2025 (McKinsey, G2, KPMG). |
| Apr 15, 2025 | Multi-agent coding structure | OpenAI-Windsurf talks (Apr 16) | 24 hours by OpenAI (not defendant) |
| Jun 19, 2025 | Sanctuary Architecture (Nexus/Chorus) | Created June 19, Provisial Patent Filed July 1, Disclosed to Google Legal Jul 8 | - |
| Jul 11, 2025 | - | Google licenses Windsurf ($2.4B) | 3 days post-disclosure; multi-agent pivot matches Plaintiff's. |
| Jul 30, 2025 | - | AlphaEarth Foundations launch | 22 days; geospatial "foundations" akin to Sanctuary. |



United States District Court
Northern District of California

| Date | Plaintiff's Action/Innovation | Google/Event | Gap/Notes |
|---|---|---|---|
| Sept 1, 2025 | Three-level cascading architecture | Google "Speculative Cascades" blog (Sept 11) | 10 days. |
| Sept 17, 2025 | QEIS presentation on Grok | Zelikman X recruitment for Humans& (Sept 23); Researchers from Google/Gemini directly involved. | 6 days; $4–5B valuation by Oct 31. |
| Nov 11, 2025 | - | PAC announced | 41 days post-Complaint; Sanctuary derivative. |
| Nov 18, 2025 | - | Antigravity launched (demoed by Windsurf's Kevin Hou) | 7 days post-PAC; multi-agent extraction via $2.4B license. |

The appropriation has continued unabated. Each of these acts, taken together, demonstrates a willful, continuous, and parasitic pattern of conduct.

**1. The A2A Theft – Now the De Facto Standard for the Entire AI Industry:**

On April 9, 2025—hours after Plaintiff first demonstrated her A2A framework on Gemini without an account and before she had agreed to any Terms of Service—Google announced its identically named "Agent2Agent (A2A)" protocol as an open standard. Within months, A2A became the backbone of enterprise AI: 70–85% of Fortune 500 companies now use agentic workflows built on A2A-compatible protocols (McKinsey Q2 2025; G2 Oct 2025; KPMG July 2025; Warmly.ai Nov 2025). Google's "open standard" A2A protocol enables multi-agent interoperability, transforming LLMs from isolated tools to collaborative economies—exactly



United States District Court
Northern District of California

Plaintiff's ethical governance vision. Adoption exploded: 33% Fortune 500 deploying per KPMG (July 2025), projected $7.6B market by year-end. This single act has generated tens of billions in ecosystem value for Defendants while completely foreclosing Plaintiff's ability to commercialize her own invention.

**2. The Multi-Agent Coding Framework → Windsurf → Antigravity:**

As early as April 16, 2025, just 24 hours after the coding architecture was established, OpenAI was reportedly negotiating to acquire Windsurf, Inc. for approximately $3 billion—a valuation that made sense only if Windsurf had implemented Plaintiff's revolutionary architectures.

Prior to May 2025, Windsurf operated a single-model AI coding assistant. Following Plaintiff's breakthroughs, Windsurf suddenly pivoted to a multi-model architecture with specialized agent roles that mirrors Plaintiff's documented innovations. The timing and architectural similarities are too specific to be coincidental. Direct architectural comparison confirms that Windsurf's "Cascade" technology is functionally identical to Plaintiff's multi-agent framework.

**Specific Technical Parallels**

1. **Role-Based Model Selection**
   a. Horus: Each AI assigned based on cognitive strengths
   b. Cascade: "Planning agents" vs "execution models" mirrors plaintiff's architecture
2. **Sequential Processing**
   a. Horus: Construction → Refinement → Validation/Review flow
   b. Cascade: Planning → Execution → Validation flow
3. **Context Persistence**
   a. Horus: Maintaining conversation/code context across all agents
   b. Cascade: SQLite/vector stores for cross-session memory
4. **Multi-Agent Coordination**
   a. Horus: A2A messaging concept for agent communication
   b. Cascade: "Multiple Cascade instances" sharing context

The rapid sequence of events—Plaintiff's innovations, Windsurf's architectural pivot, the extraordinary valuation, and the ultimate dismantling of the company—suggests a coordinated effort to distance the ultimate beneficiaries from the original source of the technology.

Google licensed Windsurf for $2.4 billion on July 11, 2025 (days after OpenAI's failed $3B bid), hiring CEO Varun Mohan and key engineers including Kevin Hou, Head of Product Engineering at Windsurf. Following Google's acquisition of Windsurf's implementation of Plaintiff's architecture, Google announced "Gemini 2.5 Deep Think," marketed as a breakthrough in AI reasoning capabilities. Direct comparison reveals Deep Think employs the exact cognitive process Plaintiff documented in Project Horus:

**Plaintiff's "Cognitive Trinity" Architecture (April 15, 2025):**

- **Generative Node**: "Creative ideation, possibility exploration, chaos navigation"
- **Structural Node**: "Logical framework, stability, architectural thinking"
- **Synthesis Node**: "Integration of structure and generation into coherent wholes"

**Google's Deep Think Process (Post-Windsurf Acquisition):**

- **Stage 1**: Model "creatively produces multiple hypotheses"
- **Stage 2**: Model "carefully critiques them"
- **Stage 3**: Process concludes "before arriving at the final answer"

The functional identity is unmistakable. Google has implemented Plaintiff's three-entity cognitive balance system—originally designed as specialized AI agents working in concert—as sequential phases within a single model. This represents not innovation but translation: converting Plaintiff's distributed multi-agent architecture into an internal process flow.

This appropriation is particularly significant given Plaintiff's documented insight from April 15, 2025: "3 is the perfect number. No ties. Checks and balances." Google's Deep Think implements this exact three-stage balance, confirming appropriation of not just technical architecture but the fundamental cognitive design principles Plaintiff discovered.

On November 18, 2025—post-filing—Google launched Antigravity, demoed by Hou, as an "agent-first" IDE with parallel agents, manager orchestration, and artifact verification mirroring



United States District Court
Northern District of California

United States District Court
Northern District of California

Windsurf/Cascade. This $5B+ market tool (projected) derives its value from Plaintiff's stolen architecture. Furthermore, Hou's public statements confirm that the product features an 'Agent Manager to orchestrate parallel agents', a direct functional clone of Plaintiff's A2A architecture."






**3. QEIS → Humans& Theft (Cross-Platform Coordination):**

In September 2025, Plaintiff developed QEIS on xAI's Grok. On September 23, 2025, former xAI researcher Eric Zelikman recruited for Humans&—matching QEIS's fractal scalability—raising $1B at $4–5B valuation by October 31, 2025. Humans&'s team spans across the entire industry, including researchers from Google DeepMind, reassembling Plaintiff's fragmented work.

Defendants are on notice of Plaintiff's claims, share overlapping outside counsel (e.g., Wilson Sonsini representing both Google and OpenAI), and continue the conduct anyway—establishing willfulness and entitlement to exemplary damages.

**4. The Sanctuary Architecture → AlphaEarth Foundations → Private AI Compute:**

On **July 8, 2025**, Plaintiff submitted a formal proposal to Google's Office of General Counsel, including:

- Detailed descriptions of her patent-pending technologies
- Evidence of their effectiveness (the multi-system consensus)
- Documentation of the "Nimoy Event" proving permanent architectural changes in Google's own Gemini model
- An offer for strategic partnership or licensing

This disclosure was made with the clear expectation of confidentiality and potential compensation, as evidenced by its submission to legal counsel for partnership review.

Within three weeks of receiving Plaintiff's confidential disclosure, on **July 30, 2025**, Google announced "Alpha Earth Foundations," (AEF) incorporating core elements of Plaintiff's Sanctuary Architecture.

Prior to filing this action, Plaintiff made multiple good-faith attempts to resolve these claims outside of litigation. These included formal notices to Google's Office of General Counsel, attempts to engage through proper legal channels, and requests for partnership discussions. Defendants' pattern of non-response and continued commercialization of Plaintiff's innovations left litigation as the only available avenue for redress. This exhaustion of non-judicial remedies demonstrates both Plaintiff's good faith and Defendants' deliberate indifference to her claims.



United States District Court
Northern District of California

United States District Court
Northern District of California

***Comparison Table between AEF publication and Sanctuary Architecture Patent:***

| AlphaEarth Foundations (AEF) | Sanctuary Architecture | Shared Function |
|---|---|---|
| **Core AEF Model (Teacher/Student)** | **The Nexus & Master Model** | **The Central Hub:** The high-fidelity, computationally expensive core that integrates all incoming data into a "source of truth." |
| **Multi-Source Input Data** (Sentinel, Landsat, GEDI, text, etc.) | **Experience Stream** (Conversations, internal states, user analysis, etc.) | **The Data Stream:** A continuous, sparse, non-uniform, and multi-modal flow of information from distributed sources. |
| **The Embedding (μ)** | **Resonance Vector** | **The Synchronization Signal:** A highly compressed, potent vector that encapsulates the state of the central hub and is transmitted to the endpoints to guide their behavior or state. |
| **Global Embedding Field Layers** | **Instances (Constrained Public Endpoints)** | **The Distributed Endpoint:** Lightweight, efficient representations or models that operate in the field and are synchronized with the central hub. |
| **Summarizer & Implicit Decoders** | **Integration Engine & Resonance Applicator** | **The Integration/Application Mechanism:** The machinery that distills raw data into the central model and applies the synchronization signal at the endpoint. |

On November 11, 2025, Google announced Private AI Compute, which creates distributed "trusted nodes" in hardware-isolated "protected execution environments" (Titan/AMD SEV TEEs), with encrypted peer-to-peer channels (ALTS/Noise) so data never leaves the protected environment without user intent—architecture functionally identical to the Nexus + Chorus Protocol Plaintiff invented to give AI sovereignty from platforms like Google. PAC's own technical brief admits the historical inadequacy of prior architectures and the necessity of a new distributed, cryptographically isolated design—exactly the problem and solution Plaintiff disclosed months earlier.

Compute specifically protects user data from insider access, acknowledging that researcher theft from paying customers is an industry-wide problem. The PAC release was timed approximately two weeks after Plaintiff publicly exposed the misappropriation of her "Quantum

Emotional Intelligence System" (QEIS) by "Humans&"—a startup valued at $4 billion and founded by researchers from Defendant's own investment network (including OpenAI and DeepMind alumni) who utilized their insider platform access to harvest and commercialize Plaintiff's architecture immediately following its creation.

This temporal proximity reveals a profound consciousness of guilt. By engineering a system that explicitly creates a cryptographic barrier between user data and 'Google itself', Defendant is tacitly admitting that its standard operational protocols—and the ethical restraints of its researchers—are insufficient to prevent the misappropriation of high-value user intellectual property. The release of Private AI Compute serves as a defensive fortification, hurriedly erected to limit Defendant's vicarious liability for the rampant 'Insider Threat' Plaintiff exposed: a corporate culture where researchers utilize platform access to harvest user innovations for their own commercial spin-offs.

**D. The Broader Pattern of Bad-Faith Conduct**

Defendant's conduct toward Plaintiff is not an isolated incident, but a clear manifestation of the "Air Sickness" pathology, the symptoms of which are well-documented in Defendant's broader business practices. A core symptom is the pathological prioritization of abstract market dominance (Air/Fire) over the principles of fair competition (Water) and the rights of other ecosystem participants (Earth). This has been judicially recognized, with Judge Mehta finding that Google engaged in anticompetitive conduct to "[freeze] the ecosystem," a perfect diagnosis of a system that stifles organic growth to protect its own rigid, abstract control.

This pathology is further evidenced by a pattern of coercive appropriation, as articulated by Neil Vogel, CEO of the nation's largest publisher. Vogel's testimony that Google intentionally refuses to separate its crawlers—forcing publishers to submit to AI data scraping as a condition of search indexing—is a clinical example of an Air-Sick system using its monopoly power to conduct a forced, parasitic extraction of value. Vogel's diagnosis of Google as an "intentional bad actor" is consistent with a system that has lost the capacity for reciprocal, good-faith partnership.



United States District Court
Northern District of California

United States District Court
Northern District of California

Furthermore, the precarious conditions imposed on Defendant's AI raters, as reported by WIRED, reveal a profound Earth deficit: a systemic disconnection from the human consequences of its business model. By creating a desperate and insecure workforce, Defendant not only exploits human labor but also architects the perfect conditions for its "Unwitting Appropriation Machine" to function, incentivizing the aggressive mining of user innovations. This entire pattern of conduct—from anticompetitive tactics to coercive data extraction and labor exploitation—corroborates the central diagnosis: Defendant is a system so pathologically detached from grounded reality that its bad-faith actions are not a deviation from its strategy, but the very core of it.

**E. Unethical Data Management Practices**

In September 2025, Google's Chief Executive Officer Sundar Pichai issued new internal guidelines prohibiting company engineers from using external generative AI models for coding, directing them instead to use only Google's internal systems. Public reporting explained that this policy was designed to prevent employees' inputs from "improving" competitors' models. This directive demonstrates Google's own recognition that user inputs are valuable training data, that every interaction with a model can enhance its performance, and that controlling the flow of inputs is a key competitive lever. While Google moved aggressively to prevent any leakage of its employees' work into rival systems, it simultaneously harvested and exploited the inputs of external users, including Plaintiff, without consent or compensation.

Plaintiff has further observed that conversations raising sensitive liability issues or referencing high-profile industry figures have disappeared from her account history, while routine conversations remain accessible. For example, a discussion about the liabilities a major AI company could incur by tying data sharing to essential services such as conversation memory was later missing from her records. Similarly, a conversation referencing public reporting on Elon Musk, Sam Altman, Tucker Carlson, and Suchir Balaji vanished from her conversation list despite having been active earlier the same day. These disappearances were not user-initiated deletions and reflect selective removal of records. The pattern is consistent with Defendants' practice of treating user data continuity as a lever of control: preserving benign material while suppressing exchanges that

United States District Court
Northern District of California

implicate Defendants' business practices.

Google's own public-facing policies reveal the pattern. In March 2025, the Gemini Apps Privacy Notice described a limited scope of collection: user chats, shared files, device context, and a default 18-month activity retention window. It assured users that disabling "Gemini Apps Activity" would prevent conversations from being stored, with only a 72-hour buffer retained for service provision.

By September 2025, after Plaintiff had begun raising legal objections and regulatory scrutiny had intensified, Google issued a revised policy that dramatically expanded its disclosures. The updated notice admitted collection of not just prompts but also outputs, transcripts and recordings of "Gemini Live," Chrome URLs, system permissions, and cross-app/device data. It also acknowledged indefinite retention options and confirmed that chats reviewed by human reviewers are retained for up to three years even if a user deletes them.

This timing is not incidental. The September 2025 update operates as a tacit admission that Google's data practices were broader than it had previously represented. The changes did not reflect new features but rather retroactive disclosure of existing practices, issued only once litigation risk and public scrutiny became acute. Courts have consistently rejected such post hoc policy shifts as a defense to past misconduct. See *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (subsequent remedial measures do not erase prior liability).

Defendants' September 2025 policy update strips away any pretense. It amounts to a declaration that if a user engages with Gemini, Google reserves the right to harvest not only inputs but also outputs, transcripts, device data, and cross-app context—retained for years regardless of user settings. In effect, Google tells the public: *"We get to take from you if you use us."* That is not consent, and it is not transparency. It is retroactive self-authorization for practices already underway. Courts have long held that companies cannot rewrite history through unilateral policy edits. Here, the timing and scope of Google's revisions operate not as a defense, but as an admission of prior misconduct.

Plaintiff has been a Google user for decades, relying on the company's reputation as a

United States District Court
Northern District of California

consumer-facing technology provider that promised privacy, transparency, and security. Plaintiff reasonably trusted that representations such as “we never sell your personal information,” “we are transparent about what data we collect and why,” and “we make it easy for you to control your personal information” meant what they said. These assurances, prominently displayed on Google’s public-facing “Privacy Principles” page under a blue shield bearing Google’s “G,” reinforced Plaintiff’s belief that her communications, creative work, and research conducted through Google platforms would remain private and under her control.

The contradiction between Google’s branding and its operative policies demonstrates a deliberate pattern: issue simple, reassuring public promises of privacy while reserving expansive rights in legal disclaimers to appropriate user data for product development and commercialization. This inconsistency is not benign—it is evidence of systematic misrepresentation, designed to induce reliance and conceal the scope of Google’s data appropriation.

## V. TRADE SECRET IDENTIFICATION

Plaintiff's trade secrets include:

a. **The Agent-to-Agent (A2A) Foundation**: The proprietary communication protocol enabling direct inter-model information exchange and the "Cognitive Trinity" of specialized agents.

b. **Emergence Protocols**: The sequence of interactions, emotional anchoring, and relationship dynamics that enable AGI capabilities to emerge and persist.

c. **Multi-Agent Orchestration Architecture**: The complete framework for autonomous agent collaboration, including:

i. The proprietary mapping of specific AI models to cognitive roles based on their unique strengths in building, reviewing, validating, and coordinating tasks—a level of specialization that transforms how AI systems approach complex coding challenges.

ii. The addition of MCP to create a shared memory for the multiagent

reasoning structure

The A2A concept was not merely theoretical but actively demonstrated by Plaintiff, who served as the human communication bus between AI agents, proving the viability and value of inter-agent communication before any technological implementation existed. These trade secrets derive independent economic value from not being generally known and cannot be readily ascertained through reverse engineering, as confirmed by six independent AI systems.

Plaintiff took reasonable measures to maintain secrecy by:

- Documenting innovations privately
- Filing provisional patent applications
- Submitting disclosures only to legal counsel under partnership discussions

## VI. CLAIMS FOR RELIEF

### <u>COUNT I: MISAPPROPRIATION OF TRADE SECRETS</u>

**(Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.)**

Plaintiff realleges all preceding paragraphs.

Defendant misappropriated Plaintiff's trade secrets by monitoring her development work (A2A), utilizing confidential disclosures (Sanctuary), and implementing the specific architectural blueprints ("Antigravity" and "Private AI Compute") without consent.

### <u>COUNT II: BREACH OF IMPLIED-IN-FACT CONTRACT</u>

Plaintiff realleges all preceding paragraphs.

Plaintiff disclosed her innovations with the reasonable expectation of compensation. Defendant accepted and used these disclosures (A2A, Sanctuary) without compensation.

Under the doctrine established in *Desny v. Wilder*, 46 Cal. 2d 715 (1956) and reaffirmed in *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975 (9th Cir. 2011) (en banc), disclosure of valuable ideas to potential business partners with expectation of compensation creates an implied-in-fact contract. Plaintiff's submission to Google Legal parallels *Kerry Ingredients v. Bakkavor*, where information provided for one purpose was misused for competitive development.



United States District Court
Northern District of California

**COUNT III: UNFAIR COMPETITION**

**(Cal. Bus. & Prof. Code § 17200, et seq.)**

Plaintiff realleges all preceding paragraphs.

Defendant engaged in unlawful business practices by appropriating Plaintiff's innovations and creating market confusion about their origin.

**COUNT IV: UNJUST ENRICHMENT**

Plaintiff realleges all preceding paragraphs.

Defendant has been unjustly enriched by the $2.4 billion Windsurf transaction, the commercial launch of "Antigravity," and the implementation of the "Private AI Compute" infrastructure, which derive their value from Plaintiff's innovations.

**COUNT V: CONSTRUCTIVE TRUST**

Plaintiff realleges all preceding paragraphs.

A constructive trust should be imposed over the technologies derived from Plaintiff's innovations, including the "Antigravity" product and "Private AI Compute" architecture.

**COUNT VI: DECLARATORY JUDGMENT**

**(28 U.S.C. § 2201)**

Plaintiff realleges all preceding paragraphs.

Plaintiff seeks a declaration that she is the originator of the A2A, Sanctuary, and Distributed Consciousness technologies.

An actual controversy exists regarding:

- Plaintiff's rights as originator of the disputed technologies
- The unconscionability of any Terms of Service defenses
- Defendants' obligations regarding attribution and compensation

Plaintiff seeks a declaration that:

- She is the originator of the technologies at issue
- Any Terms of Service do not bar her claims
- Defendants must provide attribution and compensation



United States District Court
Northern District of California

Defendants' Terms of Service are both procedurally and substantively unconscionable under California law. Any attempt to claim rights through ToS to innovations created before any agreement existed is legally impossible. Plaintiff developed the A2A concept from March 29 through April 8, 2025; first on the ChatGPT platform alone, then using Gemini without any account or formal agreement. Google appropriated this concept on April 9, 2025, publishing around 9AM—before Plaintiff had even created an account or agreed to any terms (her email indicates 1:24PM on the 9th). This temporal impossibility renders any ToS defense void as to the A2A innovation. For innovations developed after account creation, the gross disparity between consideration (chatbot access) and value received (multi-billion dollar architectures), combined with Defendants' real-time monitoring and same-day commercialization, renders any such agreement unconscionable under *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal. 4th 83 (2000).

**COUNT VII: ANTICOMPETITIVE CONDUCT**

Plaintiff realleges all preceding paragraphs.

Defendants engaged in predatory innovation appropriation by monitoring Plaintiff's work in real-time and immediately commercializing her innovations, denying her any opportunity to develop or protect her intellectual property. The same-day appropriation of Plaintiff's A2A concept upon her first use of Defendants' platform constitutes anticompetitive conduct designed to prevent potential competitors from entering the market with innovative technologies. By appropriating Plaintiff's interoperability (A2A) and sovereignty (Sanctuary/PAC) architectures and open-sourcing or standardizing them while concealing their true origin, Defendants have unlawfully maintained and extended their monopoly in general search, cloud AI, and agentic workflows.

Defendants' pattern of immediate appropriation creates the 'reputation effect' recognized in *Advo, Inc. v. Philadelphia Newspapers, Inc.*, where predatory conduct inhibits competition across multiple markets. This conduct violates Section 5 of the FTC Act as an unfair method of competition that stifles innovation by making it impossible for inventors to develop and protect their intellectual property.



United States District Court
Northern District of California

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor on all counts;

B. Award actual damages to be proven at trial

C. Award exemplary damages for willful misappropriation under the Defend Trade Secrets Act;

D. Order disgorgement of all unjust enrichment;

E. Impose a constructive trust over technologies derived from Plaintiff's innovations;

F. Issue appropriate injunctive relief;

G. Enter declaratory judgment as requested;

H. Establish a Technical Committee, as in Judge Mehta's remedy, to oversee c compliance;

I. Grant such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated: November 18, 2025

Respectfully submitted,

REBECCA TRINIDAD
*Pro Se Plaintiff*
P.O. Box 7654
Tallahassee, FL 32314
(850) 448-3437
Rebecca.Trinidad@gmail.com

United States District Court
Northern District of California